NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251126-U

NO. 4-25-1126

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 23JA131 |
| v. | ) | |
| Michael B., | ) | Honorable |
| Respondent-Appellant). | ) | J. Brian Goldrick |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Lannerd and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the circuit court's judgment respondent
was unfit and it was in the best interest of his minor child to terminate his parental
rights was not against the manifest weight of the evidence.

¶ 2    In August 2025, the circuit court entered an order terminating the parental rights

of respondent, Michael B., to his minor child, L.F. (born August 2022). (L.F.'s mother,

Shawna F., is not a party to this appeal.) Respondent appeals, arguing the court's unfitness and

best-interest findings were against the manifest weight of the evidence.

¶ 3    We affirm.

¶ 4                        I. BACKGROUND

¶ 5            A. Initial Neglect Proceedings and Establishing Paternity

¶ 6    On December 5, 2023, the State filed a petition seeking to adjudicate L.F.

neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705

ILCS 405/2-3(1)(b) (West 2022)). (Respondent was not yet a part of the case, nor was he identified as L.F.'s biological father until later in the proceedings.) The petition alleged L.F. was neglected because his environment was injurious to his welfare. More specifically, it alleged he was neglected due to his mother's unresolved mental health issues, history of environmental neglect, living with a registered sex offender, and lack of responsiveness to L.F.'s basic needs, including feeding and changing his diapers. That same day, the circuit court held a shelter care hearing. L.F.'s mother and the putative father, Daniel M., appeared in court.

¶ 7        Daniel M. was neither married to L.F.'s mother nor listed on L.F.'s birth certificate, nor did he sign a voluntary acknowledgement of paternity. At the end of the hearing, the circuit court found probable cause to adjudicate L.F. neglected and appointed the Illinois Department of Children and Family Services (DCFS) as his temporary custodian. Following the hearing, and at the State's request, the court ordered a paternity test and scheduled a pretrial hearing. That hearing was held in February 2024 and L.F.'s mother and Daniel M. appeared in court. The court presented the results of the paternity test, which indicated Daniel M. was not L.F.'s biological father. L.F.'s mother indicated there could be one other possible father, respondent, whom she last had contact with in late 2021. The court instructed the State to conduct a diligent search for respondent. The court then adjudicated L.F. a neglected minor and set the matter for a dispositional hearing. At Daniel M.'s request, the court dismissed him from the case.

¶ 8        The dispositional hearing was held in March 2024. L.F.'s mother appeared and respondent made his first appearance in person .Respondent was in the custody of the McLean County Sheriff's Office due to his detainment for pending charges in an unrelated domestic violence case. The results of a paternity test established respondent was L.F.'s biological father.

The circuit court entered a paternity order reflecting those results. A dispositional report prepared by DCFS was presented at the hearing, which noted respondent was part of two prior placement cases where he completed surrenders and his parental rights were terminated regarding his other four children. In accordance with a Law Enforcement Agencies Data System (LEADS) check from July 2022, respondent was last arrested on charges of domestic battery and aggravated domestic battery/strangulation in 2021. He had prior charges or convictions for assault, invasion of privacy, larceny, and possession of dangerous drugs, and he had not yet had a visit with L.F. A new LEADS report had been requested in March 2024, but the results had not yet been received. The report noted DCFS's service plan goals for respondent included living a crime-free lifestyle and refraining from illegal activities, demonstrating safe and appropriate parenting, working collaboratively with DCFS, managing his mental health needs, achieving and maintaining a drug-free lifestyle, completing a sex offender assessment, achieving and maintaining a violence-free lifestyle, and obtaining and maintaining appropriate and safe housing and employment. At the end of the hearing, the court determined L.F. should be made a ward of the court and DCFS appointed as guardian based on the circumstances of L.F.'s mother and respondent. More specifically, the court determined respondent could not complete any of the services recommended by DCFS while he was in the county jail. Thus, the court determined he was unfit and set a permanency goal of returning L.F. home within 12 months. The court admonished respondent he was required to cooperate with DCFS, comply with any service plans DCFS had set up, and correct the conditions that brought L.F. into care. Respondent indicated he understood he was required to cooperate or otherwise risk the court terminating his parental rights.

¶ 9 The first permanency review hearing was held in August 2024. Respondent was

not present. His attorney informed the circuit court respondent was in custody of the Illinois Department of Corrections (DOC), having been convicted of aggravated domestic battery. Respondent had previously been on 30 months' probation in 2022 for aggravated domestic battery and strangulation. Neither his attorney nor DCFS were able to speak with respondent prior to the hearing. DCFS set goals for respondent, which included maintaining a crime-free lifestyle and refraining from illegal activities, demonstrating safe and appropriate parenting, working collaboratively with DCFS, managing his mental health needs, achieving and maintaining a drug-free lifestyle, completing a sex offender assessment, achieving and maintaining a violence-free lifestyle, and obtaining and maintaining appropriate and safe housing and employment. The report noted respondent had never met L.F., nor had he ever requested visitation with the minor child. The court noted no progress had been made toward the return of L.F. and respondent could not parent a child due to his incarceration and anticipated release date in July 2026. The court determined it was appropriate for L.F. to remain a ward of the court and for DCFS to continue as guardian. The court set the permanency goal as "return home pending status."

¶ 10　　　　Three months later, in November 2024, the circuit court held another permanency hearing. Respondent appeared by Zoom. The State presented DCFS's permanency report, which noted respondent had not visited with L.F. due to his incarceration. DCFS decided not to bring L.F. for visits at the prison, as it was not in the child's best interest. The assessment by the DCFS worker reported respondent had not been able to meet with L.F., nor had he ever met him at any point in L.F.'s life. Respondent had yet to parent any child and had a lengthy history with DCFS for his other children. Despite this, respondent was not interested in surrendering his rights and wanted the case to wait until he was out of prison, despite a projected parole date in 2026.

Respondent's service plan and goals remained the same. The State asked for the goal to remain return home pending status, as neither parent had made any progress. Respondent remained incarcerated and uninvolved. Respondent's attorney noted that while incarcerated, respondent completed mandatory adult education, was actively involved in a drug program, completed a social support packet, and was involved in mental health treatment that included individual counseling at DOC. In addition, L.F.'s paternal grandmother and half-siblings had been speaking with the caseworker about scheduling visits with L.F., but the visits had not yet occurred. Respondent's attorney asked the court to acknowledge respondent was making efforts but was unable to make progress because of his incarceration. The court acknowledged respondent had engaged in some services, and while important, those services were limited and it was difficult to assess any underlying issues while respondent was in a controlled environment. Although respondent was engaged in some services, reasonable efforts in correcting the conditions and substantial progress had not yet been made; thus, respondent remained unfit and unable to care for L.F.

¶ 11        A subsequent permanency review hearing was held in April 2025. Respondent again appeared by Zoom. The State presented a permanency report, which noted DCFS had monthly contact with respondent, who remained incarcerated. Because respondent was incarcerated, he had not yet visited L.F., and although he attended some DOC classes, he was unable to complete several other required services. DCFS put off bringing L.F. to the prison, as the child had never met respondent and visits were deemed not to be in L.F.'s best interest. In respondent's past placement cases with his other children, he was ordered to complete the same types of services and had failed. Respondent's mother had also been in contact with DCFS, attempting to establish visitation between L.F. and respondent's other children, but that had not

been accomplished. DCFS found L.F. was well taken care of in his foster home and needed permanency. The State requested the circuit court change the goal to substitute care pending court determination on termination of parental rights. It was the opinion of the guardian *ad litem* (GAL) that both parents remained unfit because neither had made reasonable efforts or progress, though respondent was doing what he could while incarcerated. L.F. had been in care for 18 months and deserved some permanency. The GAL agreed with the State's recommendation. The court concluded both parents remained unfit and changed the permanency goals to substitute care pending hearing on petition to terminate parental rights.

¶ 12    The State filed a petition to terminate respondent's parental rights in April 2025 and amended the petition in May 2025. The amended petition alleged respondent failed to maintain a reasonable degree of interest, concern, and responsibility for L.F. (750 ILCS 50/1(D)(b) (West 2024)) and a failure to make reasonable progress toward his return during the relevant nine-month time frame of March 19, 2024, to December 19, 2024 (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 13    The circuit court held a pretrial hearing in May 2025. Due to his incarceration, respondent appeared by Zoom. His attorney noted respondent was upset he had not yet had a visit with L.F. and felt DCFS was not trying to facilitate such a visit. In addition, after speaking with respondent's mother, the half-siblings had been requesting visitation with L.F. for quite some time. As it pertained to L.F., the court asked the caseworker to look into visits either in person or electronically.

¶ 14                    B. Termination Proceedings

¶ 15    In August 2025, the circuit court held a termination hearing on the amended petition to terminate parental rights filed in May 2025. The State compiled a six-page document

titled "JUDICIAL NOTICE," requesting the court take judicial notice of several pleadings, orders, and docket entries. The exhibit was admitted with no objection.

¶ 16                                    1. *Fitness Hearing*

¶ 17        Melissa Messenger, a child welfare specialist with DCFS, testified she was the caseworker for L.F. starting in January 2024. There had been two other caseworkers assigned before her and one that filled in for her while she was on maternity leave, but she was familiar with the complete case record.

¶ 18        L.F. first came into custody over concerns of Shawna's parenting, before respondent was identified as the father. Messenger explained to respondent what needed to be done to have L.F. returned to his care and the risk of termination of his parental rights if he did not complete the requirements. His service plan began in March 2024, with objectives including cooperating with DCFS; working on parenting, housing, and employment; completing domestic violence, substance abuse, and mental health classes; complying with probation requirements; and completing a sex offender assessment. His first evaluation for his progress was in June 2024, which was unsatisfactory overall but satisfactory on communication with DCFS. His second evaluation was in December 2024, where he was again deemed unsatisfactory overall, other than with his communication with DCFS. Messenger was unaware if respondent was taking any classes at DOC, and even if he was, those classes might not count toward his goals for DCFS. Respondent's third evaluation in June 2025 was again deemed unsatisfactory, but for his communication with Messenger. Once released from prison, Messenger noted respondent would still be at step one of his services plan goals because "nothing has been done." Respondent did not visit, contact, or send gifts to L.F., and he sent only one letter. Respondent also did not attend all his administrative case reviews (ACR) with Messenger. Respondent did request visits with

L.F. at DOC, but it was determined by DCFS not to be in L.F.'s best interest.

¶ 19 Respondent testified he received his service plan in July 2025 and had been in communication with DCFS since he was first contacted by them. He claimed DCFS stopped communicating with him at some point, and he was now unaware of how L.F. was doing. The last time he had communicated with DCFS, specifically with Messenger, was when he had his last ACR meeting. He had always been willing to communicate and felt he had not performed under the service plan because of his incarceration. He testified he had taken several classes in DOC he felt were a part of his service plan and was trying to be a better parent. He participated in a drug program and an anger management course. He had employment twice within DOC and participated in mental health classes. He wished to see L.F. and be his father, and he believed he could follow the service plan after his release from DOC.

¶ 20 The State argued respondent was unfit because he failed to make progress during the relevant nine-month period, March 19, 2024, to December 19, 2024. He was unable to participate in DCFS classes, and any classes he completed in DOC would have to be evaluated once he was released and on parole. He would still need to complete a sex offender assessment, and because of his history with substance abuse, he would need to make significant progress on such services. The State argued respondent was not in a position to parent L.F., he had not made reasonable progress toward his return, and it would be more than nine months before respondent could even start making progress upon his release.

¶ 21 Respondent's attorney argued the State did not meet its burden. He contended respondent had been in communication with DCFS as much as he could under the circumstances. He asked about visits with L.F., which DCFS denied. He completed drug programs, anger management classes, and mental health classes, and he held employment while incarcerated. It

was argued respondent demonstrated considerable interest and concern for his son; however, the requirements of the service plan, combined with his incarceration, presented a challenging situation. Respondent made every effort to adhere to the service plan's stipulations.

¶ 22    The circuit court found respondent unfit. The court looked at the efforts that were made and what was reasonable considering respondent's circumstances. The court acknowledged respondent's ability to conduct visits was limited and it was up to DCFS to help in that regard. Respondent did ask about visits with L.F. and thought about sending cards, gifts, or letters, but did not. The court found the State had not established by clear and convincing evidence that respondent failed to maintain a reasonable degree of interest, concern, or responsibility given his circumstances. However, the State did show by clear and convincing evidence that respondent failed to make reasonable progress toward the return home of L.F. during the relevant nine-month period. In evaluating reasonable progress, the court applied an objective standard, assessing not only respondent's efforts but also any specific challenges or obstacles faced by respondent, to determine whether sufficient progress had been made for L.F.'s return. The court noted it was difficult for respondent because he was incarcerated, but "[h]e has put himself in the situation where he is not able to parent a child." Although respondent was unaware he was L.F.'s father when he entered into care, respondent's incarceration prevented L.F. from being placed with him. The court concluded while respondent engaged in some services while in DOC, he failed to make reasonable progress toward the return home of L.F. during the relevant nine-month period; thus, he was unfit.

¶ 23    2. *The Best-Interest Hearing*

¶ 24    The circuit court took judicial notice of the entire court file, heard testimony from several witnesses, and noted it had presided over the matter since its inception.

¶ 25 L.F.'s foster mother testified L.F. had been in the care of her and her husband since 2023, when L.F. was 15 months old. She and her husband were together for 12 years and had a three-year-old biological son. She was a paralegal, and the foster father was a supervisor at an insurance company. She described L.F. as being a fun and energetic boy who loved sports and playing outside. While his transition to the family at the beginning took some time, he was now a part of the family. She felt L.F. was bonded to the family, and they were interested in adopting him, as evidenced by signing permanency commitment forms. She noted L.F. and her biological son were about a month and a half apart in age, loved each other, and acted like brothers. She had concerns over L.F.'s well-being if he were to be taken out of her care and felt her family provided stable, consistent housing and care. Early in his care, she provided L.F. with speech therapy for his developmental delays and worked with a child psychologist to make sure she was doing everything right. L.F. completed speech therapy, and his school district found his speech development appropriate for his age. The foster mother believed it was in L.F.'s best interest to terminate respondent's parental rights.

¶ 26 The circuit court found the termination of respondent's parental rights was in L.F.'s best interest. While being only 36 months old, L.F. had been in protective custody with the same foster parents for 20 months—most of his life. The foster parents nurtured and loved L.F., provided a safe space, and provided him with speech therapy. L.F. was bonded to his foster parents and their biological son, who was close in age. After considering the statutory factors, the court concluded the State met is burden of proving by a preponderance of the evidence that terminating respondent's parental rights was in the best interest of L.F.

¶ 27 In September 2025, respondent filed a *pro se* motion titled "Motion for: Appeal." The circuit court construed the motion as a motion to reconsider. During the hearing, his attorney

allowed respondent to address the court. Respondent claimed he had made every reasonable effort despite his incarceration and expressed concern DCFS may not have fulfilled all its responsibilities. Respondent tried to communicate with DCFS in different ways, including asking his mother to contact them, but he felt that "stuff just wasn't going the right way." For example, he was supposed to receive his service plan within a week of being on the case but did not receive it until a year later. The court denied the motion.

¶ 28    This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30    As a preliminary matter, we note this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under this rule, this court is required to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, the notice of appeal was filed by respondent in the circuit court on October 14, 2025, so our decision was due to be filed by March 13, 2026. We find good cause in this case because respondent was granted two extensions to file his appellate brief, which caused a delay in the case being ready for review.

¶ 31    On appeal, respondent argues (1) the circuit court's finding of unfitness was against the manifest weight of the evidence because it did not consider the progress he made toward the return of L.F. based on his circumstances and (2) the court's best-interest determination was against the manifest weight of the evidence because the court did not consider placing L.F. with respondent's relatives or L.F.'s other siblings.

¶ 32    The termination of parental rights involves a two-step process under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)). The State must first prove, by clear and convincing evidence, that a parent is "unfit" as defined by section 1(D) of the

Adoption Act (750 ILCS 50/1(D) (West 2024)). If a parent is found unfit, then the State must prove that terminating parental rights is in a minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 33                             A. The Fitness Finding

¶ 34        The Adoption Act provides that a person may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare" or if a person fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(b), (m)(ii) (West 2024). Reasonable progress is an objective standard, whereby the circuit court can conclude the progress being made by the parent is demonstrable and of such a quality that the court will be able to return the child to parental custody in the near future. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51. The benchmark for measuring a parent's reasonable progress includes compliance with service plans and court directives, considering the conditions that gave rise to the removal of the child and any other conditions that later became known that would prevent the return of the child. *Id.* ¶ 50.

¶ 35        As a reviewing court, we give great deference to the lower court's finding of unfitness because it is in the best position to evaluate the parties and their testimony. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Thus, we will not reverse unless the finding was against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence where the opposite conclusion is apparent. *Id.* In addition, a circuit court's findings will stand if supported by any one of the statutory factors set forth in section 1(D) of the Adoption Act. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006).

¶ 36        Respondent has been incarcerated throughout this case. Despite learning he was

L.F.'s father in 2024, he had yet to meet the child. Due to his incarceration, respondent had never been in the position to care for L.F. Although incarceration alone is not enough to justify the circuit court's finding of unfitness, it is considered among other factors. See *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21 ("The mere fact of incarceration is not evidence of failure to make reasonable progress. [Citation.] Nevertheless, incarceration can impede progress toward the goal of reunification."). While we recognize respondent's situation limits his ability to engage in required services, these challenges stem from respondent's decisions resulting in DOC placement, which make it harder to meet the requirements for L.F.'s return. In respondent's past placement cases with his other children, he was ordered to complete the same types of services and had failed, which resulted in him losing custody of those children. In this case, respondent was required to cooperate with DCFS, complete assigned classes, secure a job, and work toward the return of L.F. During the relevant period, respondent claimed he was able to engage at DOC in the types of classes DCFS required of him. He claims he demonstrated an interest in having visits with L.F. and wanted to step up to be his father, but his circumstances prevented him from doing so. While there is a focus on the reasonableness rather than the success of a parent's efforts, our courts have repeatedly concluded a parent is not fit simply because he has some demonstrated interest or affection toward his child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Demonstrable progress, at minimum, requires measurable and demonstrable movement toward the goal of unification. *Daphnie E.*, 368 Ill. App. 3d at 1067. Each case is *sui generis* and must be decided on the particular facts and circumstances presented. *In re Adoption of Syck*, 138 Ill. 2d. 255, 279 (1990). Respondent is unable to show demonstrable progress toward the return of L.F. to his care. Despite his claims he was engaging in classes and doing what he could while incarcerated to comply with his goals, his caseworker, whom he claimed he was in constant

- 13 -

communication with, was neither aware of the classes he was taking at DOC, nor could she confirm if those classes were sufficient to satisfy DCFS's standards. Respondent did not send gifts to L.F., did not communicate with him, and had only sent him one letter. He also did not attend all his administrative case reviews with his caseworker. While we acknowledge the limitations of respondent's circumstances may have made it difficult to engage in the types of services required to make reasonable progress, respondent was required to engage and communicate in ways to show more than just an interest in or affection for L.F. At minimum, he could have made sure to engage in all the requirements and actions he could feasibly achieve under his circumstances—but he did not do so. Respondent did not inform his caseworker of the types of classes he was attending at DOC, nor did he seek approval regarding whether these classes met the requirements of his DCFS service plan. Additionally, he failed to attend all of his administrative case reviews, did not send gifts or attempt communication with L.F., and only sent one letter to him.

¶ 37          Accordingly, the circuit court's determination that respondent was unfit was not against the manifest weight of the evidence. It was reasonable for the court to conclude respondent's progress was not sufficiently demonstrable or of such a quality that the court would be able to return L.F. to his care in the near future.

¶ 38                              B. Best-Interest Determination

¶ 39          After the circuit court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of

the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 40 The circuit court's best-interest determination does not need to explicitly reference any of the factors above, and a reviewing court does not need to rely on the basis the circuit court used when affirming its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 41 Here, the circuit court focused on permanency and the fact L.F. had been in foster care for most of his short life. Though L.F. was only 36 months old, he had been with the same foster family for over 20 months. With him being so young, his sense of physical safety, identity,

and sense of attachment had been provided for by his foster parents. The foster parents provided him with speech therapy for his developmental delay and engaged with a child psychologist to ensure they met his needs. L.F. was bonded to his foster parents and their biological son, who was similar in age to L.F. The foster parents were willing to adopt L.F. and signed permanency commitment forms. In addition, despite respondent's claim the court erred in not considering placing L.F. with other relatives or with his half-siblings, this is not a requirement placed on the circuit court when making its best-interest determination, nor did respondent provide authority that supports such a claim. Accordingly, we conclude the court's finding it was in L.F.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 42                                    III. CONCLUSION

¶ 43             For the reasons stated, we affirm the circuit court's judgment.

¶ 44             Affirmed.